**[J-72-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA, | : | No. 66 MAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| Appellant | : | Commonwealth Court at No. 1066 |
| | : | CD 2017 dated May 18, 2018 |
| | : | Reversing the Order of the Office of |
| v. | : | Open Records at No. AP 2017-0593 |
| | : | dated July 7, 2017. |
| | : | |
| PENNSYLVANIA STATE POLICE, | : | ARGUED: November 19, 2019 |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE WECHT**                                        **DECIDED: June 16, 2020**

The Right-to-Know Law ("RTKL")[1] "is designed to promote access to official government information in order to prohibit secrets, scrutinize the actions of public officials, and make public officials accountable for their actions."[2] In 2009, the General Assembly enacted the RTKL, replacing its predecessor Right to Know Act with an alternative paradigm that more strongly tilted in favor of maximizing transparency.[3]

---

[1]      *See* Act of Feb. 14, 2008, P.L. 6, No. 3, 65 P.S. §§ 67.101, *et seq.*

[2]      *Pa. State Educ. Ass'n v. Commonwealth, Dep't. of Cmty. & Econ. Dev.*, 148 A.3d 142, 155 (Pa. 2016).

[3]      *See Pa. State Police v. Grove*, 161 A.3d 877, 892 (Pa. 2017); *Levy v. Senate of Pa.*, 65 A.3d 361, 368 (Pa. 2013) (noting that the RTKL "significantly expanded public access to governmental records").

Accordingly, when resolving disputes regarding the disclosure of government records, agencies and reviewing courts must begin from a presumption of transparency. Of sound necessity, there are statutory exceptions to that presumption, one of which is at issue in this case. But the Office of Open Records ("OOR"), which reviews appeals of agencies' refusal to disclose documents pursuant to statutory exemptions, and courts reviewing OOR's decisions, must construe such exceptions strictly, lest they subvert the RTKL's purpose.[4] In this case, the Commonwealth Court overturned OOR's ruling directing disclosure of a Pennsylvania State Police policy document, and it did so without considering the entirety of the record upon which OOR based its decision. We agreed to review the court's self-imposed limitation upon its review of OOR's decision. We hold that the court abused its discretion. Thus, we vacate its ruling, and we remand.

In March of 2017, the American Civil Liberties Union ("ACLU") filed a RTKL request with the Pennsylvania State Police ("PSP") seeking disclosure of PSP's "complete, un-redacted AR 6-9 regulation, which establishes policies and procedures for PSP personnel when using social media monitoring software." OOR Final Determination, 7/17/2017, at 1 (hereinafter, "O.F.D."). On March 13, 2017, PSP provided the ACLU with "a heavily-redacted nine-page document entitled 'AR 6-9 Real-Time Open-Source-Based Investigation and Research'" (hereinafter, "the Policy"). *Id.* at 1-2. The Policy comprised ten sections numbered 9.01 through 9.10. Of these, only Section 9.01 ("Purpose") was entirely unredacted.[5] Sections 9.03 ("Utilization of Real-Time Open Sources as an

---

[4]     *See Pa. State Police v. Grove*, 161 A.3d 877, 2017 (Pa. 2017).

[5]     PURPOSE

The purpose of this regulation is to establish policies and procedures for the use of real-time open sources in crime analysis, situational assessments,

Investigative Tool"), 9.04 ("Authorization to Access Real-Time Open Sources and/or Real-Time Open-Source Networks"), 9.05 ("Authorization Procedures for the Use of Online Aliases and Online Undercover Activity"), 9.06 ("Deconfliction"), 9.07 ("Utilizing Real-Time Open-Source Monitoring Tools"), 9.08 ("Source Reliability and Content"), and 9.10 ("Utilization of Real-Time Open Sources for Employment Background Investigations") were entirely redacted but for their titles. Sections 9.02 ("Definitions") and 9.09 ("Documentation and Retention") were redacted in part. In sum, the redactions obscured approximately seven pages of the nine-page document.

PSP also provided the supporting verification of Kim Grant, the Deputy Agency Open Records Officer for PSP, in which she cited what we will refer to as "the public safety exception" as the basis for the redactions. Verification of Kim Grant, 3/13/2017, at 1-2. That provision exempts from disclosure "[a] record maintained by an agency in connection with the military, homeland security, national defense, law enforcement or other public safety activity that, if disclosed, would be reasonably likely to jeopardize or threaten public safety or preparedness or public protection activity." 65 P.S. § 67.708(b)(2).

On April 3, 2017, ACLU filed an appeal and brief with the OOR, asserting that PSP had not provided a sufficient basis for its invocation of the public safety exception. As

---

criminal intelligence, criminal investigations, and employment background investigations. The policies and procedures contained herein are not meant to address one particular form of real-time open source, but rather real-time open sources in general, as advances in technology will occur and new tools will emerge.

Policy at 1 ¶9.01.

required by statute, an appeals officer[6] was assigned. *Id.* § 67.1101(a)(2). The appeals officer sent the parties a briefing schedule.

The ACLU's OOR brief began by accurately reviewing the governing burdens and standards, as provided by the RTKL and judicial decisions interpreting that statute. Under the RTKL, "[a] record in the possession of a Commonwealth agency . . . shall be presumed to be a public record" unless it is exempt under Section 708, protected by a privilege, or exempt from disclosure under other federal or state law or regulation or a judicial order. *Id.* § 67.305(a). Pursuant to Section 708, "[t]he burden of proving that a record of a Commonwealth agency or local agency is exempt from public access shall be on the Commonwealth Agency . . . by a preponderance of the evidence." *Id.* § 67.708(a)(1).[7]

To date, ACLU noted, only the Commonwealth Court has translated the statutory burden into an evidentiary test relative to the public safety exception. Under that test, PSP must establish (1) that "the record at issue relates to a law enforcement or public safety activity," and (2) that "disclosure of the record would be 'reasonably likely' to threaten public safety or a public protection activity." *Carey v. Pa. Dept. of Corrs.*, 61 A.3d 367, 374-75 (Pa. Cmwlth. 2013). Demonstrating reasonable likelihood "requir[es] more than speculation." *Id.* at 375. To establish such likelihood, the agency must submit

---

[6] For ease of reference, for the balance of the opinion we refer to OOR and the appeals officer interchangeably as context warrants.

[7] Although this Court has not defined the preponderance of the evidence standard in the RTKL context, we consistently liken the standard to "a more likely than not inquiry, supported by the greater weight of the evidence; something a reasonable person would accept as sufficient to support a decision." *In re Vencil*, 152 A.3d 235, 246 (Pa. 2017) (cleaned up). The Commonwealth Court applies substantially the same definition in RTKL cases. *See*, *e.g.*, *Del. Cty. v. Schaefer, ex rel. Phila. Inquirer*, 45 A.3d 1149, 1156 (Pa. Cmwlth. 2012).

specific evidence, and it may satisfy its burden by affidavit. Where it relies upon an affidavit, it must "(1) include[] detailed information describing the nature of the records sought; (2) connect[] the nature of the various records to the reasonable likelihood that disclosing them would threaten public safety in the manner described; such that, (3) disclosure would impair [the agency's] ability to perform its public safety functions." *Id.* at 376. Merely citing the affiant's experience and alleging a general risk of a threat to public safety or an impairment of the agency's public protection activities will not suffice. *See* OOR Brief for ACLU at 2 (citing *Harrisburg Area Comm. Coll. v. OOR*, 2110 C.D. 2009, 2011 WL 10858088, at *7 (Pa. Cmwlth. May 17, 2011) (unpublished) (hereinafter "*HACC*")[8]).

ACLU contended that Ms. Grant's affidavit failed to satisfy this burden, and requested the opportunity to brief the matter further if PSP provided a supplemental affidavit. *Id.* at 3 n.2. ACLU also suggested that it might be appropriate for OOR to review the unredacted record *in camera* against any such affidavit. *Id.* at 3.

In its response, PSP explained the bases for its redactions as embodied in the sworn affidavit of Major Douglas J. Burig, a twenty-two-year PSP veteran serving as the Director of PSP's Bureau of Criminal Investigation (hereinafter, "the Burig Affidavit" or "the Affidavit").[9] Major Burig detailed his background and averred that disclosure of the redacted information in the Policy "would jeopardize PSP's ability to conduct criminal

---

[8]     The Commonwealth Court's Internal Operating Procedures allow a party to cite an unreported and non-precedential decision of the Commonwealth Court for its persuasive value. *See* Pa. Code § 69.414(a).

[9]     The Director "oversee[s] Divisions responsible for intelligence gathering, specialized criminal investigation support units, complex criminal investigations, and drug investigations." *See* Burig Affidavit at 1 ¶3.

investigations and other law enforcement activities it engages in to protect the public." Burig Affidavit at 2 ¶6. He then reviewed the redacted sections one by one, briefly describing each section's function and explaining in relatively general terms why he believed that disclosure of the redacted material would impede law enforcement or compromise public safety. *Id.* at 3-4 ¶¶7-13.

In reply, ACLU argued that the Burig Affidavit did not satisfy the stringent *Carey* standard because it did not "tie each of [the] nine sections' redactions to reasonable public safety concerns." OOR Reply Brief for ACLU at 2. Furthermore, other law enforcement agencies publicly released their social media investigative policies (in one case, with minimal redaction), which appeared to be "substantially similar" to the Policy. *Id.* ACLU cited this as cause to question Major Burig's assertions regarding the risks of disclosure.[10]

The appeals officer then sent the parties an email indicating that "this case would benefit from a review of the records *in camera*." Email, Jordan Davis to ACLU and PSP, 5/18/2017. He also asked whether either party objected to *in camera* review. Both parties responded that they had no objection. *See, e.g.*, Email, Nolan Meeks to Jordan Davis, 5/19/2017 ("PSP has no objection to the *in camera* review."). PSP provided the unredacted record for review *in camera*. Following review, and without a hearing,[11] OOR issued its final decision in ACLU's favor.

---

[10] To support this claim, ACLU attached to its OOR Reply Brief what it contended were parallel policy documents from the Philadelphia Police Department, the Salt Lake City Police Department, and the Orange County (California) Intelligence Assessment Center, all of which were publicly available with limited or no redactions.

[11] OOR noted that, in reviewing an appeal, it "shall . . . [r]eview all information filed relating to the request. . . . The appeals officer may admit into evidence testimony, evidence and documents that the appeals officer believes to be reasonably probative and relevant to an issue in dispute." O.F.D. at 3 (quoting 65 P.S. § 67.1102(a)(2)). OOR

OOR characterized the Policy as "describ[ing] best practices, authorization procedures, purposes and limitations for PSP Troopers when using internet resources— including, but not limited to, sites commonly described as 'social media' sites—in a professional capacity." O.F.D. at 4. OOR characterized PSP as contending that "the disclosure of the record would be reasonably likely to threaten public safety because knowledge of the restrictions and techniques under which PSP Troopers work could permit third parties to more easily evade PSP's online efforts and hinder PSP's attempts to investigate criminal matters or perform background checks." *Id.* at 5. Acknowledging Major Burig's section-by-section account of the reasons for the redactions, OOR found that "the essential thread of his argument is that a third party with possession of these materials could use them to avoid PSP's scrutiny online, gauge which platforms of discussion PSP commonly uses, and craft strategies to render PSP unable to effectively monitor their sources." *Id.*

OOR also reviewed the Policy section by section, explaining in broad terms why, as to each, the Affidavit's claims regarding the likely effect of disclosure did not square with the text of the redacted material. *See id.* at 6-9. But it suffices for our purpose to focus upon OOR's broader observations. In this regard, OOR prefaced its section-specific analyses as follows:

> [T]he authorizations and prohibitions contained in each section are generalized, permitting PSP to use various open-source tools whenever it suspects criminal activity. The processes described throughout are strictly internal and administrative in nature, providing third parties with no opportunity to intercept or alter any Trooper's request or clearance to conduct any investigation. Where the policy does touch upon interaction

determined that the Burig Affidavit and the underlying unredacted record were sufficient to decide the matter. *Id.*

with outside parties, it merely prohibits PSP Troopers from breaking applicable laws in furtherance of their investigations.

*Id.* at 5-6. OOR expressed due regard for Major Burig's expertise, and in no way challenged his good faith, but found that "the threats outlined in [the Affidavit] simply do not match the text of the policy." *Id.* at 9. Thus, OOR directed PSP to provide the unredacted Policy to ACLU. *Id.* at 10.

PSP filed a petition for review of OOR's ruling in the Commonwealth Court pursuant to 65 P.S. § 67.1301(a).[12] After briefing closed, the court *sua sponte* ordered OOR to supplement the certified record with the unredacted Policy, noting that "the certified record on appeal shall consist of evidence an appeals officer considers when making a determination, including records that OOR accepted under seal and that an appeals officer reviewed *in camera*." Cmwlth. Ct. Order, 4/2/2018, at 1 (citing *Pa. Dept. of Educ. v. Bagwell*, 114 A.3d 1113 (Pa. Cmwlth. 2015)). However, the court ultimately reversed OOR's decision without reviewing the unredacted Policy. *PSP v. ACLU*, 1066 C.D. 2017, 2018 WL 2272597, at *6-7 (Pa. Cmwlth. May 18, 2018) (unpublished), slip op. at 5.[13]

In its decision, the Commonwealth Court acknowledged the presumption in favor of disclosure, that statutory exemptions from disclosure must be construed strictly, and that the consequent burden of proving that a record qualifies wholly or in part for a statutory exemption lies with the agency seeking its protection. Similarly, the court invoked *Carey*'s two-part approach to determining the application of the public safety

---

[12] PSP's appeal automatically stayed release of the Policy pending the Commonwealth Court's decision. *See* 65 P.S. § 67.1301(b).

[13] All subsequent citations of the "Commonwealth Court Opinion" refer to the slip memorandum.

exception, inquiring whether: (1) the record relates to a law enforcement or public safety activity, and (2) disclosure would be reasonably likely to threaten public safety or a public protection activity. Cmwlth. Ct. Op. at 5. Because the Policy undisputedly related to public safety, the only contested question concerned the likelihood that disclosure of the unredacted Policy would threaten public safety or a public protection activity.

The court acknowledged that establishing the likelihood of a threat to the public required more than mere "speculation," but added that the agency is not required to establish a *definite* threat. *Id.* (citing *Woods v. OOR*, 998 A.2d 665, 670 (Pa. Cmwlth. 2010)). Where an agency seeks to satisfy its burden by providing an affidavit explaining how disclosure may risk public safety, the Commonwealth Court examines whether the affidavit:

> (1) includes detailed information describing the nature of the records sought; (2) connects the nature of the various records to the reasonable likelihood that disclosing them would threaten public safety in the manner described; such that (3) disclosure would impair the agency's ability to perform its public safety functions in relation to what the agency claims to be the alleged threatening consequence.

*Id.* at 6 (quoting *Carey*, 61 A.3d at 376)) (cleaned up). In effect, establishing the exception "depends on the level of detail in the supporting affidavit." *Id.* (quoting *Fennell v. Pa. Dept. of Corrs.*, 1827 C.D. 2015, 2016, 2016 WL 1221838, at *2 (Pa. Cmwlth. Mar. 29, 2016) (unpublished)).

After briefly contrasting its decision in *Woods* with its ruling in *HACC, supra*,[14] the court turned to the Burig Affidavit. The court noted Major Burig's extensive experience,

---

[14] In *Woods*, the court held that the public safety exception applied to Board of Probation and Parole records concerning supervision strategies for sex offenders. *See Woods*, 998 A.2d at 670. In *HACC*, the court found that the affiant failed to establish an adequate basis for applying the public safety exemption to the agency's DUI arrest

acknowledged his prefatory assertion that public release of the redacted sections would jeopardize the effectiveness of PSP investigations in derogation of its public safety function, and then reviewed his assertions in support of each of PSP's redactions. But it conducted this review in isolation, declining to compare it to the Policy itself. The court took each of Major Burig's assertions at face value and, on that basis, concluded that the Affidavit "was legally sufficient to sustain PSP's burden." *Id.* at 10. The court noted that "[w]here, as here, the affiant bases his conclusions that such harm [to public safety or a public protection activity] is reasonably likely on his extensive experience, such conclusion is not speculative or conclusory." *Id.* at 11-12. Ultimately, the court found that the Burig Affidavit satisfied *Carey*'s three-part test, showing "a nexus between the disclosure of the information at issue and the alleged harm," thus satisfying PSP's burden. *Id.* at 12 (quoting *Fennell*, 2016 WL 1221838, at *2).

In rejecting ACLU's request that the court review the unredacted Policy *in camera* to test the Affidavit's consistency with the Policy, the court explained:

> In addition to such review being unnecessary given the detailed nature of [the Affidavit], in general, where this [c]ourt has reviewed an unredacted document *in camera*, those situations usually have involved exemptions claimed under the attorney-client privilege or the predecisional deliberative process. *See Twp. of Worcester v. OOR*, 129 A.3d 44, 60 (Pa. Cmwlth. 2016) (stating *in camera* review is appropriate to assess claims of privilege and predecisional deliberations). However, as PSP argues, those

---

curriculum because the affidavit was conclusory in asserting that disclosure would jeopardize a public protection activity, providing insufficient detail as to how disclosure might cause such a result. *See HACC*, 2011 WL 10858088, at *7. In neither case did the court review the records *in camera*. Moreover, in finding an agency affidavit insufficient to carry the agency's burden and vacating OOR's order applying the public safety exemption, the *HACC* court remanded to OOR to reconsider its determination, noting that OOR had "a responsibility to develop a fuller record using the means granted to it in the RTKL, such as conducting a hearing or examining the subject records in camera." *Id.* at *8. It so ruled specifically because the court "lack[ed] a sufficient record with which to conduct meaningful or effective appellate review." *Id.*

situations are distinguishable. There, the actual *words on the page* are key to the determination, whereas here, it is *the effect of the disclosure* that is key. In other words, here, the actual words on the page are not at issue; rather, the issue is whether disclosure of those words "would be 'reasonably likely' to threaten public safety or a public protection activity." As stated, Major Burig's Affidavit sufficiently addresses that issue.

*Id.* at 13 (cleaned up; emphasis added).

In sum, the Commonwealth Court ruled that, where the *effect* of a disclosure is at issue, as it is with the public safety exception, an agency expert's affidavit is unassailable if it complies facially with the *Carey* standard and exhibits no indication of bad faith. Thus, the affidavit succeeds or fails based solely upon its contents. We granted review to speak to this and related issues.[15]

As described above, when an agency denies a record request under the RTKL in whole or in part (*i.e.*, subject to redactions), the requestor may file an appeal with OOR.

_____

[15] Our order granting allowance of appeal recited the issues as stated by ACLU:

> a. Did the Commonwealth Court err in holding that the use of *in camera* review is inappropriate when the public-safety exemption is claimed and should be reserved for cases involving assertions of attorney-client privilege, the work-product protection, and the predecisional-deliberation exception?
>
> b. Given the standard understanding of plenary review, did the Commonwealth Court err when it reversed the OOR findings of fact without reviewing all of the evidence that OOR reviewed to make those findings?
>
> c. Did the Commonwealth Court err in finding that the Burig Affidavit, on its face, provided sufficient evidence of a threat to public safety to justify each of the redactions to PSP's social media-monitoring policy—including the redaction of the "definitions" section and the provisions regarding social-media research on prospective employees?

*PSP v. ACLU*, 198 A.3d 336 (Pa. 2018) (*per curiam*). Our resolution of the first two issues makes it unnecessary to reach the third, which will be a matter for the Commonwealth Court to consider on remand. The Dissent appears to criticize us for "focus[ing] on the reviewing tribunal's scope of review," "[r]ather than address[ing] the sufficiency of the Burig Affidavit." Diss. Op. at 5. But the former question clearly was the central concern as to which we granted allowance of appeal.

OOR then assigns an appeals officer to review the denial. *See* 65 P.S. §§ 67.1101(a)(1)-(2). OOR has thirty days following receipt of the appeal to issue its final determination, and the appeals officer has discretion to hold a hearing before issuing his determination. OOR shall provide a written explanation of the reason for the decision. *Id.* §§ 67.1101(b)(1), (3).

Upon receipt of OOR's decision regarding a state-level agency record, the aggrieved party may file a petition for review as a matter of right to the Commonwealth Court. *Id.* § 67.1301(a). "The record before [the reviewing] court shall consist of the request, the agency's response, the appeal filed under section 1101, the hearing transcript, if any, and the final written determination of the appeals officer." *Id.* § 67.1303(b). "The decision of the court shall contain findings of fact and conclusions of law based upon the evidence as a whole. The decision shall clearly and concisely explain the rationale for the decision." *Id.* § 67.1301(a).

Because ACLU has framed its challenge partially in terms of the scope and standard of review that apply to RTKL appeals in the Commonwealth Court, and because this Court addressed that subject at length in *Bowling v. Office of Open Records*, 75 A.3d 453 (Pa. 2013), we begin our analysis by reviewing that case. In *Bowling*, this Court examined the Commonwealth Court's standard of review of challenges to OOR decisions. After comparing the unusual, single-tier administrative adjudicative regime applicable under the RTKL and enumerating the RTKL's many departures from more conventional administrative processes, we concluded that a court reviewing an appeal under the RTKL—in this case, the Commonwealth Court; in other cases the Court of Common

Pleas[16]—is "the ultimate finder[] of fact and that [it is] to conduct full *de novo* reviews of appeals from decisions made by RTKL appeals officers, allowing for the adoption of the appeals officer's factual findings and legal conclusions when appropriate." *Bowling*, 75 A.3d at 474. Thus, while the reviewing court need not feign blindness itself to any factual findings OOR recited to support its ruling, the court owes such findings no peculiar deference, as might be due in reviewing administrative decisions in other contexts. *See generally id.* at 470.

The *Bowling* Court also addressed the correct *scope* of review to apply to OOR determinations, noting that "'[s]cope of review' refers to the confines within which an appellate court must conduct its examination, *i.e.*, the 'what' that the appellate court is permitted to examine." *Id.* (quoting *Holt v. 2011 Legislative Reapportionment Comm'n*, 38 A.3d 711, 728 (Pa. 2012)). The RTKL's lone provision on the subject specifies that "[t]he record before [the reviewing] court shall consist of the request, the agency's response, the appeal filed under section 1101, the hearing transcript, if any, and the final written determination of the appeals officer." 65 P.S. § 67.1303(b). The two scope-related questions that the *Bowling* Court considered were: (1) whether the record transmitted by OOR should include *only* those items mentioned, but nothing else OOR might have considered in rendering its decision; and (2) whether the reviewing court had discretion to expand upon the record it received in furtherance of its function as the ultimate finder of fact. *Bowling*, 75 A.3d at 462.

---

[16]     OOR decisions pertaining to local agency records are appealable as of right to the Court of Common Pleas for the county where the agency is located. *See* 65 P.S. § 67.1302(a).

As to the first question, this Court noted the parties' agreement that the reviewing court should receive the entirety of OOR's evidence, offering the following explanation:

> We believe that the Legislature intended the record to be certified to this Court pursuant to Section 1303(b) to include evidence and documents admitted into evidence by the appeals officer. To hold otherwise—that the record certified to this Court should not contain relevant, probative evidence considered by the OOR—would be an absurd reading of Section 1303(b). *See* 1 Pa.C.S. § 1922(1) (stating 'the General assembly does not intend a result that is absurd, impossible of execution or unreasonable'). It would also frustrate appellate review of the determination to exclude from this Court's review the evidence that was before the appeals officer.

*Id.* at 476 (quoting *Dept. of Transp. v. Office of Open Records*, 7 A.3d 329, 333-34 (Pa. Cmwlth. 2010)) (cleaned up). Relatedly, while we recognized that the reviewing court is the ultimate finder of fact, we also recognized by implication that OOR exercises a fact-finding function in the first instance, or it would make no sense to grant the reviewing court the option of adopting an appeals officers' findings of fact in any case. *See id.* at 474.

As to the second question, citing various RTKL provisions involving secondary fact-finding that *only* a reviewing court could make, we held that the reviewing court also may expand the record to fulfill its statutory role as the ultimate finder of fact. *Id.* We described these two conclusions in tandem as granting the reviewing court "the broadest scope of review." *Id.* at 477. Thus, whatever facts OOR finds, they do not bind the reviewing court and are not entitled to deference on appeal.

The *Bowling* Court also noted that, speaking generally, the scope of review may expand or contract according to the reasons the lower tribunal gives for its holding, focusing in particular on the context of an appeal from a trial court order granting a new trial. The Court noted that, if the court granting a new trial cites finite and specific reasons for its ruling, the appellate court must consider the adequacy of those reasons specifically.

However, where a trial court provides no such reason, the court must expand its review to the entire record to determine whether any reason of record supports the ruling. Thus, while the appellate court's *standard* of review remained invariant, the portions of the record it might consider, *i.e.*, the *scope* of its review, varied according to the trial court's proffered reasoning, if any. *See id.* at 474-76.

The question in this case concerns whether the reviewing court, reviewing the case *de novo* subject to the broadest, or "plenary," scope of review, *must* consider the entirety of the record that OOR relied upon in reaching its decision. ACLU maintains that the Commonwealth Court erred in disregarding the unredacted Policy when reversing OOR, because OOR relied upon that Policy in reaching its decision. PSP, conversely, insists that the facial sufficiency of the affidavit alone controls the outcome such that the court had no obligation, and indeed no cause, to consider the Policy.

Neither the RTKL nor *Bowling* clearly answers this question, but *Bowling* offers guidance. In particular, the *Bowling* Court noted the absurdity of denying the reviewing court access to any evidence of whatever kind that OOR considered in reaching its decision, explaining that it would "frustrate appellate review of the determination to exclude from this Court's review the evidence that was before the appeals officer." *Id.* at 476. However, in simultaneously extolling the reviewing court's obligation to address an RTKL appeal *de novo*, *Bowling* revealed a difficulty inherent in the structure of RTKL review. In identifying the reviewing court as the ultimate finder of fact and granting it plenary authority to expand the record beyond that developed before OOR, *Bowling*'s account of the RTKL imbues the reviewing court with a dual role implicating functions associated with both trial and appeal in conventional legal settings. It is, as this Court

noted in *Bowling*, absurd to suggest that an appellate court, *as such*, should be denied access to the entirety of the record considered by the decision-maker subject to review. But it is less so if the reviewing court is functioning more as a trial court in considering a case *de novo*. And this Court indicated in *Bowling* that the reviewing court may choose to adopt OOR's factual findings and legal conclusions, a curious suggestion if the reviewing Court, functioning more like a trial court, is understood to be starting from scratch.

There is no easy way to unpack this, and the parties offer only limited guidance. As in *Bowling*, we confront a question that is thorny precisely because the RTKL has no analog in other administrative and quasi-judicial frameworks, and the RTKL does not conclusively address the matter. That being said, even if we recognize that the court is *reviewing* OOR's previously-made decision, we need not then hold that the reviewing court commits an error of law simply because it declined to take into account any given piece of evidence that OOR sought, admitted, or considered. In the more common trial court-appellate court setting, an appellate court is not bound to review every piece of evidence that the trial court received or cited. Rather, it considers only that which it deems necessary to render a decision, a calculation that varies and which lies in the reviewing court's sound discretion—bound, of course, by the applicable scope and standard of review.

We discern no basis to rule otherwise in this case. As noted in *Bowling*, it would be untenable to deny a reviewing court access to the entirety of the record presented to OOR. But it would be equally unreasonable to deny the reviewing court—especially here, as the ultimate finder of fact—the discretion to determine what evidence is relevant in any

given case. Recognizing such discretion as part and parcel of the fact-finding function, however, comes with its own limitation; even where broad discretion is granted, it may be abused.

Imposing an abuse of discretion standard upon a court reviewing an OOR determination preserves ample latitude for that reviewing court under the RTKL to tailor its approach and analysis to the needs of a given case, honoring both its trial-like and appellate-like functions. But on appeal of the *reviewing* court's decision—in the case at bar, in this Court by permission; in case of a local agency decision, in the Commonwealth Court following *de novo* review by the Court of Common Pleas—the appellate court must review the lower court's decision for an abuse of discretion. The first reviewing court, exercising *de novo* review with a plenary scope of review, will abuse its discretion only when it overrides or misapplies the law; exercises manifestly unreasonable judgment; or manifests partiality, bias, or ill will. *See Van Dine v. Gyuriska*, 713 A.2d 1104, 1105 (Pa. 1998).

Against this backdrop, we can address the substantive question concerning whether the Commonwealth Court erred or abused its discretion in reversing OOR's decision without comparing Major Burig's affidavit to the unredacted Policy, effectively taking Major Burig at his word that disclosure of the redacted material would imperil public safety or impair PSP's investigative work.

ACLU notes that this Court held in *Bowling* that "the foundational question of whether a record or document is exempt from disclosure is a factual one." *Bowling*, 75 A.3d at 476. While in most adjudicative contexts, factual questions are resolved following an adversarial presentation before a neutral fact-finder, this traditional

mechanism is unavailable in RTKL disputes because the requestor lacks access to the record in question when litigating the question of access. Thus, ACLU could not "directly join issue with the Burig [A]ffidavit" before OOR because it could not speak to the accuracy of Burig's characterization of the record or rebut his account of the likely effect of its full disclosure. Brief for ACLU at 15.

ACLU submits that the "principal counterweights to this structural imbalance are (1) the presumption of disclosure; and (2) the ability of the [OOR] Appeals Officer to review the records *in camera*" to consider, where warranted, the accuracy of the affiant's descriptions and "the nexus between the consequences described in the affidavit and the text of the record itself." *Id.* ACLU notes that this Court has spoken favorably of *in camera* review as an appropriate check under the RTKL's predecessor, the Right to Know Act. *See LaValle v. Office of Gen. Counsel*, 769 A.2d 449, 458 n.14 (Pa. 2001) (noting, without deciding, that "sound policy would appear to support the availability of an *in camera* procedure, where appropriate, and perhaps, in some circumstances, its requirement upon proper demand"); *see also Commonwealth, Office of Open Records v. Center Twp.*, 95 A.3d 354, 366-67 (Pa. Cmwlth. 2014) (citing *Lavalle* and opining that "*in camera* review provides an essential check against the possibility that a privilege may be abused").[17]

---

[17] In a Dissenting Statement to this Court's denial of allowance of appeal in *Schenck v. Township of Center, Butler County*, 975 A.2d 591 (Pa. 2009) (Saylor, J., dissenting), two justices took a favorable view of *in camera* review to ensure that exceptions to the RTKL are properly invoked. Now-Chief Justice Saylor took care to note that "government bodies should be afforded a presumption of good faith," *id.* at 597, but, citing *LaValle*, espoused the value of *in camera* review as a hedge against accepting *ipse dixit* affidavits as sufficient on their face to sustain an exception. *See id.* at 599 ("As to the availability of *in camera* review, I agree with the many jurisdictions that have had little difficulty recognizing the availability of such a procedure in the discovery and public disclosure arenas.").

ACLU also concedes that "[t]here may be some instances when it is easy to determine whether the affiant has correctly described the record at issue." Brief for ACLU at 16.[18] Where it is *not* "easy," however, "*in camera* review is the only way for a reviewer to know whether the affiant has described the document accurately." *Id.*

ACLU does not dispute that the opinions of agency affiants are entitled to "substantial respect," but it contends that such respect "does not nullify the statutory duty to 'find' the 'facts.'" *Id.* It stands to reason that an affiant supporting a given exemption will naturally incline toward "shielding the contents of the disputed record," creating "a significant risk that the affiant's description will be imprecise, incomplete, or overly generalized," none of which may be clear simply upon review of the affidavit in isolation. *Id.*

There can be no question that law enforcement agencies require the ability to protect documents that would reveal methods, protocols, identities, and other information the secrecy of which is essential to the agencies' ability to ensure public safety. Thus, even while construing the public safety exception strictly, courts should proceed with care not to narrow its application so much that public safety is compromised. Courts certainly may grant some degree of deference to law enforcement agencies' opinions regarding how disclosure of a given document might have such an effect, just as they may attend carefully to the conclusions of credible and duly qualified experts in any case. But courts should not defer so utterly to those opinions that a law enforcement agency's discretion

---

[18] *See* Reply Brief for ACLU at 5 ("To be sure, other affidavits, dealing with other records and arising in the circumstances of other cases, could certainly be drafted so as to satisfy on their face the agency's burden.").

to cabin its disclosure obligation is only as limited as its ability to fashion an affidavit that ticks off *Carey*'s three boxes.

The competing concerns for public safety and transparency converge under the RTKL to create a dilemma that implicates core principles underlying our adversarial system of justice, in which two antagonists, each with full access to the information supporting their competing theories of a given controversy, present their strongest case on the law and the facts to a neutral arbiter. Under the RTKL, where the agency in possession of a record invokes an exception, only the agency has access to the record. Since the character of the record directly or indirectly determines the applicability of an exemption, the requesting party has the unenviable task of blindly countering the agency's attempt to persuade OOR that an exception applies.[19]

The Supreme Court of Michigan, reviewing its own state Freedom of Information Act ("FOIA"), aptly described the problem and suggested solutions:

> Where one party is cognizant of the subject matter of litigation and the other is not, the normal common-law tradition of adversarial resolution of matters is decidedly hampered, if not brought to a complete impasse. If one adds to this the natural tendency of bureaucracies to protect themselves by revealing no more information than they absolutely have to, it is clear that

---

[19]    The essential intractability of this situation can be gleaned from the Commonwealth Court's own decision viewed in tandem with PSP's argument. In rejecting ACLU's argument, the court deemed it irrelevant that other law enforcement agencies' similar policies had been released as well as the substance of those policies. *See* Cmwlth. Ct. Op. at 12 n.7 ("We cannot assume that the language [of the other jurisdictions' policies] is . . . substantially similar to the redacted portions of AR 6-9, and what other police departments do with respect to releasing their policies is irrelevant to the present case."). But PSP suggests that "ACLU was free to submit an affidavit from its own expert," offering that, while such an expert "may not have been able to provide testimony specific to the redacted information in AR 6-9, the expert could have testified regarding these types of policies generally and opined on whether disclosure would jeopardize public safety." Brief for PSP at 20 n.7. But if the three exempla of such policies were irrelevant to the court, then it seems clear that no expert report or testimony on ACLU's behalf that was based upon any such policy would have affected the lower court's decision.

disclosure becomes neither automatic nor functionally obtainable through traditional methods.

The practical aspect of the matter is adverted to in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973). This is how that court saw the matter:

> This lack of knowledge by the party seeking disclosure seriously distorts the traditional adversary nature of our legal system's form of dispute resolution. Ordinarily, the facts relevant to a dispute are more or less equally available to adverse parties. In a case arising under the [federal] FOIA this is not true, as we have noted, and hence the typical process of dispute resolution is impossible. In an effort to compensate, the trial court, as the trier of fact, may and often does examine the document *in camera* to determine whether the Government has properly characterized the information as exempt. Such an examination, however, may be very burdensome, and is necessarily conducted without benefit of criticism and illumination by a party with the actual interest in forcing disclosure.

> * * * *

> [*Vaughn*, 484 F.2d at 824-25.]

> Under these circumstances the courts are challenged to find some way to compensate the inherent problems of (1) only the government knowing what is in the requested documents, (2) the natural reluctance of the government to reveal anything it does not have to, and (3) the fact that courts normally look to two equally situated adversarial parties to focus and illuminate the facts and the law.

*Evening News Ass'n v. City of Troy*, 339 N.W.2d 421, 437 (Mich. 1983) (cleaned up).

Notably, the Michigan Supreme Court's solution to these concerns went somewhat farther than ACLU requests here. In addition to requiring a detailed, particularized justification for the invocation of privilege or exemption, the court also prescribed *in camera* review to consider the persuasiveness of the justifications, *and*, in some instances, that the agency grant the requestor's counsel access to the unredacted documents under "special agreement." *Id.* at 437-38. Here, ACLU does not seek a *per se* rule requiring *in camera* review in all cases, nor does it request that its attorneys be allowed to examine the unredacted document subject to "special agreement." ACLU

argues only that the Commonwealth Court erred in reversing OOR's decision, which was based upon the appeals officer's *in camera* review, without first conducting its own *in camera* review.

PSP argues that expert testimony is necessary, and for all intents and purposes dispositive, where the relevant assessment entails speculation about the likely effect of disclosure upon public safety. So strong is PSP's position that it attempts to distinguish OOR's review of an agency affidavit from the very fact-finding function itself, contending that "*in camera* review is reserved for circumstances where there is something to be factually determined." Brief for PSP at 18. If no facts need be determined when an expert affidavit has been submitted, then perforce the affidavit *is* the fact.

PSP acknowledges that experts typically are used to assist triers of fact in comprehending matters involving specialized skill, study, or experience unfamiliar to the layperson in furtherance of their fact-finding function. *Id.* at 19. PSP also notes that the Burig Affidavit in *this* case served that purpose for OOR, and then the Commonwealth Court, in assessing whether public safety would be adversely affected by disclosure. PSP then concedes that OOR and the Commonwealth Court were free to accept or reject Major Burig's opinions. *Id.* at 19-20. But PSP insists that they may do so based only on whether the affidavit is sufficient on its face. If it hits all the necessary marks under the *Carey* test, it is presumptively unassailable.[20] *Id.* at 21.

Finally, PSP disputes ACLU's reliance upon cases such as *Commonwealth ex rel. District Attorney of Blair County,* 880 A.2d 568 (Pa. 2005), in which this Court remanded

---

[20] In light of this predominating aspect of its argument, it seems odd that PSP did not object to OOR's request for the unredacted document, despite OOR's express invitation.

to the trial court with direction to determine whether releasing an autopsy report submitted in that case could hinder or jeopardize an ongoing investigation, and specifically added that the trial court had discretion to review the report *in camera* for that purpose. *Id.* at 577-78. PSP attempts to distinguish that case on the basis that the trial court's broad discretionary authority in that context has no equal under the RTKL, because "discretionary decision-making under the RTKL [only arises] where a determination must be made regarding conflicting evidence pertaining to whether a document falls under one of the statutory exceptions." Brief for PSP at 20-21 (quoting *Bowling*, 75 A.3d at 467). Here, PSP adds, "there was no conflicting evidence" because the Burig Affidavit was the only evidence admitted as to the effect of disclosure. Again, PSP asks us to rule that, where a *Carey*-compliant affidavit has been submitted, the averments it contains regarding the probable effect of disclosure must be taken as true. *Id.* at 21.

PSP relies for its sweeping proposition principally upon the Commonwealth Court's "words on the page" versus "effects" dichotomy. But the court's reasoning in this regard was briefly stated, and cited only one of its own decisions to support its attempt to distinguish effects evidence from words on the page evidence, *Township of Worcester*, *supra*. The *Worcester* court merely determined that *in camera* review was appropriate to determine whether the pre-decisional deliberative privilege[21] applied. It did not hold that *in camera* review may *not* be relied upon to test the applicability of anything but a privilege that hinges only upon the words in the document rather than the probable effect of disclosure.

---

[21] *See* 65 P.S. § 67.708(b)(10)(i)(A).

Even if it were possible to discriminate reliably between records where an exemption depends solely upon the words on the page without consideration of the effects of disclosure (a dubious proposition at best), broader judicial practice nonetheless undermines the next premise in the Commonwealth Court's analysis, that only an expert is competent to assess such effects. Fact-finders without special expertise, including lay jurors from all walks of life with varying degrees of education and professional experience, routinely must digest complex, competing expert evidence, sometimes spanning weeks of testimony from dozens of experts, and draw detailed factual conclusions in subject areas far more esoteric than assessing the likelihood that a given disclosure of law enforcement investigative protocols will have a proposed effect. And here, of course, lay jurors are not the fact-finders in question. In their place we have experienced OOR appeals officers and seasoned jurists.

As ACLU notes, Pennsylvania courts routinely rely upon—and this Court has blessed—*in camera* review to assess the application of various privileges, including where anticipated effects of disclosure are critical elements of the determination.[22] Thus, the proposition that OOR appeals officers and courts lack competency to assess the adequacy and probity of an agency affiant's characterization of the record or the credibility of its effects assessment is untenable. Nothing in the RTKL requires that conclusion, and

---

[22] *See, e.g.*, *Dist. Attorney of Blair Cty.*, 880 A.2d at 569 (*in camera* review of an autopsy report to determine whether release would interfere with an ongoing criminal investigation); *Commonwealth v. Natividad*, 200 A.3d 11 (Pa. 2019) (*in camera* review of drug use and mental health records to determine whether disclosure would invade witness's privacy); *Octave ex rel. Octave v. Walker*, 103 A.3d 1255 (Pa. 2014) (*in camera* review of mental health records to balance privacy interests against interests of justice in disclosure). While these cases clearly are inapposite to this case, they all, to some degree, require a subjective assessment of the effects of a given disclosure.

especially where the agency already benefits from the inevitable cant in its favor that arises from having its evidence untested by countervailing evidence or informed cross-examination, it suffers no unreasonable burden in submitting to an adjudicative body's *in camera* review and credibility assessment.

Furthermore we agree with ACLU that the Commonwealth Court's ruling "eliminates one of the key structural features of the current RTKL process and creates a *de facto* presumption of non-disclosure in virtually all cases in which the public-safety (or another 'effects' exception) is at issue." Brief for ACLU at 17. The court's ruling manifestly diminishes the burden that the General Assembly imposed upon agencies seeking to withhold documents from public scrutiny. And *Carey* provides an agency affiant clear guidance on how to shape an affidavit to maximize the likelihood that a court will deem it sufficient to support the exemption invoked.

We also reject PSP's suggestion that one who seeks an *in camera* comparison of an agency affidavit to the underlying document must successfully challenge the integrity or veracity of an affiant opining against disclosure. PSP cites a number of Commonwealth Court decisions in which the court appeared to suggest that only where the veracity or good faith of an agency affiant can be questioned may an affidavit be discredited. *See Cal. Univ. of Pa. v. Schackner*, 168 A.3d 413, 418 (Pa. Cmwlth. 2017); *McGowan v. Pa. Dep't of Envtl. Prot.*, 103 A.3d 374, 382-83 (Pa. Cmwlth. 2014). While both cases allude to a generalized assumption of government agents' good faith, in neither case did the question concern the substantive accuracy or rigor of a given affiant's characterization of the content or effect of a document requiring a subjective assessment or conjecture. In *Schackner*, the reference concerned allegations that an agency would deliberately and in

bad faith delay submission of requests in a fashion that caused undue delay in requests' resolution. In *McGowan*, a case involving the pre-decisional deliberative privilege, the issue was whether the good faith of the agency could be questioned because the affidavit in support of the privilege disclaimed knowledge of the precise date that the record was created.

In keeping with this aspect of its argument, PSP charges ACLU with basing its arguments upon challenges to Major Burig's veracity and good faith, even though ACLU has said nothing at any time in these proceedings that might reasonably be construed as calling into question Major Burig's integrity or intent. *Compare* Brief for PSP at 12 ("ACLU's arguments amount to a thinly veiled attack on the credibility or veracity of the affidavit.") *with* Reply Brief for ACLU at 4 ("Major Burig's veracity and credibility are not the subject of this appeal; a person can speak truthfully and still say too little."). ACLU's argument in no way relies upon any such inference. But it is in the very nature of the adversarial system that opposing parties present their strongest cases to maximize their chances of receiving a favorable ruling. Provided they do so within the applicable ethical bounds and in accord with statutory prescriptions and rules of procedure, zealous advocacy is not only tolerated, it is expected. An agency staff member called upon to advance a basis for applying an RTKL exception can only be expected to do so in the way best suited to achieve that result, tailoring it to satisfy whatever requirements are provided by legal counsel and the law itself, or have been gleaned from the affiant's professional experience. As the Commonwealth Court noted in *Center Township*, "*in camera* review provides an essential check against the possibility that a privilege may be abused." 95 A.3d at 367.

The RTKL requires the Commonwealth Court to document findings of fact to support its ruling. But the court in this case did so only to the extent it accepted the contents of a wholly untested affidavit, necessarily vague by virtue of the limitations of what Major Burig could say without giving away too much, without availing itself of the readily available opportunity to measure the affidavit against its subject document, which the court had in its possession. The deference the Commonwealth Court granted PSP in this case operated as a presumption against disclosure that is irreconcilable with the RTKL. Where a court declines to review a challenged document *in camera* based upon the supposition that an agency affiant has accurately assessed the likely effect of a given disclosure simply because there is no facial evidence of bad faith—*especially* where OOR has conducted such a review and found the affidavit wanting under the governing standard—it simply cannot be said that the court exercised sound discretion.

We do not gainsay the importance of proceeding cautiously when confronted with credible invocations of the public safety exception. But nothing in the record suggests that OOR was incautious. To the contrary, OOR appears to have considered each redacted section carefully against Major Burig's assertions in support of the redactions and reached reasoned conclusions that it documented in a thorough final determination. Indeed, OOR's individualized discussions of Major Burig's assertions were as detailed as the affidavit itself.

We hold only that the Commonwealth Court erred in overturning OOR's reasoned decision without conducting an equally careful inquiry. The Commonwealth Court unnecessarily denied itself the opportunity to conduct the fact-finding that the RTKL asks of it. But because the Commonwealth Court is the ultimate finder of fact under the RTKL,

it would be inappropriate for us to step into its place.[23] On remand, the court at a minimum should compare the Affidavit to the provisions of the unredacted Policy that the Affidavit describes. In keeping with its authority under the RTKL, the court also retains discretion to further develop the record.

We hereby vacate the order of the Commonwealth Court and remand the case for further proceedings consistent with this opinion.

Justices Baer, Todd and Donohue join the opinion.

Chief Justice Saylor files a concurring opinion in which Justice Dougherty joins.

Justice Mundy files a dissenting opinion.

---

[23] The Dissent opines that we "impl[y] that . . . the Burig Affidavit[] was not sufficient to satisfy [PSP's] burden of proof." Diss. Op. at 1. To the contrary, we hold only that the Commonwealth Court abused its discretion in declining fully to examine OOR's evidentiary basis for reaching that conclusion. By no means do we intend to foreclose the Commonwealth Court from ruling in PSP's favor after fully reviewing OOR's basis for ruling otherwise.